TRANSCRIBED FROM DIGITAL RECORDING

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF NEVADA

 3   LYNISHA REFF, LYNDON RED,    )
     SR., TRACY HARRIS, and       )
 4   LYSCHINE WILLIAMS,           )
                                  ) Case No. 2:19-cv-01358-KJD-EJY
 5            Plaintiffs,         )
                                  ) Las Vegas, Nevada
 6   vs.                          ) August 12, 2019
                                  ) Courtroom 3A
 7   WERNER ENTERPRISES, INC.,    )
     JACKIE BROWN, and ACE        )
 8   AMERICAN INSURANCE COMPANY,  )
                                  ) Recording method:
 9            Defendants.         ) Liberty/CRD
     _____) 3:02 p.m. - 3:44 p.m.
10                                  MOTION HEARING
```

11                              *CERTIFIED COPY*

```
12                        TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE ELAYNA J. YOUCHAH
13           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
```

14

15   APPEARANCES:

```
16   For the Plaintiffs:   VANESSA MOTTA, ESQ. (Telephonic)
                           MOTTA LAW, L.L.C.
17                         3632 Canal Street
                           New Orleans, Louisiana 70119
18                         (504) 670-9490
```

19   (Appearances continued on page 2.)

20   Recorded by:          Elvia Garcia

```
21   Transcribed by:       Amber M. McClane, RPR, CCR #914
                           United States District Court
22                         333 Las Vegas Boulevard South, Room 1334
                           Las Vegas, Nevada 89101
23                         AM@nvd.uscourts.gov
```

```
24   Proceedings recorded by electronic sound recording.
     Transcript produced by mechanical stenography and computer.
25
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    APPEARANCES CONTINUED:

 2    For the Defendants:

 3         KEITH B. GIBSON, ESQ.
           MICHAEL HETEY, ESQ.
 4         THORNDAL ARMSTRONG DELK BALKENBUSH & EISINGER
           1100 East Bridger Avenue
 5         Las Vegas, Nevada 89125
           (702) 366-0622

 6

 7    -AND-

 8         RALPH J. AUCOIN, JR., ESQ. (Telephonic)
           PERRIER & LACOSTE, L.L.C
 9         365 Canal Street, Suite 1550
           New Orleans, Louisiana 70130
10         (504) 212-8820

11

12    For Non-party Medport LA, LLC:

13         DENNIS L. KENNEDY, ESQ.
           BAILEY KENNEDY
14         8984 Spanish Ridge Avenue
           Las Vegas, Nevada 89148
15         (702) 562-8820

16    -AND-

17         MARISA GUARINO STEARNS, ESQ.
           MOVEDOCS
18         6325 South Jones Boulevard, Suite 400
           Las Vegas, Nevada 89118
19         (702) 489-5687

20

21                          *  *  *  *  *

22

23

24

25
```

TRANSCRIBED FROM DIGITAL RECORDING

```
 1        LAS VEGAS, NEVADA; MONDAY, AUGUST 12, 2019; 3:02 P.M.

 2                            --o0o--

 3                   P R O C E E D I N G S

 4        COURTROOM ADMINISTRATOR:  This is the time set in the

 5   case of 2:19-cv-1358-KJD-EJY, Lynisha Reff, et al., versus

 6   Werner Enterprise, Inc., et al.

 7             Parties, please enter your appearance for the record.

 8        MR. GIBSON:  Keith Gibson, Bar Number 10050, on

 9   behalf of defendant Werner Enterprises, Jackie Brown, and Ace

10   American Insurance Company.

11        MR. HETEY:  Mike Hetey, Bar Number 5668, on behalf of

12   the same parties.

13        THE COURT:  Okay.  Is there anyone else here for

14   defendant?

15        MR. AUCOIN:  Yes.  Good afternoon, Your Honor.  Ralph

16   Aucoin participating with the Court's permission by telephone

17   on behalf of the defendants Werner, Jackie Brown, and Ace.

18        THE COURT:  And --

19        MS. MOTTA:  Good afternoon, Your Honor.  This is

20   Vanessa Motta.  I represent the plaintiffs here in Louisiana

21   with the permission of the Court's [indiscernible] on this

22   matter.

23        THE COURT:  Thank you.

24             Can counsel for defendant who's on the telephone say

25   his name again for me once?  His last name, rather.
```

TRANSCRIBED FROM DIGITAL RECORDING

1          **MR. AUCOIN:**  Aucoin.

2          **THE COURT:**  Well, it's not -- it's as bad as Youchah,

3     which is my last name.

4          And who will be arguing for defendant just before I

5     get --

6          **MR. GIBSON:**  I would, Your Honor.

7          **THE COURT:**  Okay.

8          **MR. GIBSON:**  Keith Gibson.

9          **THE COURT:**  Thank you.

10          And then plaintiff --

11          **MR. KENNEDY:**  And on behalf -- Dennis Kennedy on

12     behalf of non-party Medport LA, LLC.  And with me is my

13     co-counsel, Marisa Sterns.

14          **THE COURT:**  Okay.  Thank you, counsel, for being

15     here.  As my courtroom deputy said, we're here on the matter

16     that was filed by defendants, their emergency motion for

17     contempt against Medport.  And I have read all the papers,

18     including the emergency motion exhibits and the non-party's

19     response to that along with their exhibits.

20          I'm going to give you some preliminary thoughts so

21     you know what I'm interested in having you argue, and you --

22     you should really try your best to contain your arguments to

23     those issues because any decision I make today will be based

24     on the -- on the limited issues that I see here today.

25          In particular, I'd like to note for everybody on the

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    phone and before me, I am not deciding the ultimate
 2    admissibility of anything in this case.  I have -- I am not
 3    the appropriate court nor the appropriate court officer.  I'm
 4    simply deciding whether or not something is discoverable, and
 5    if it is, what protections need to be given to the materials
 6    that may be discoverable so that Medport, the third party,
 7    receives the appropriate, as -- as best it can, protections
 8    available.
 9            So I don't need any discussion on the Collateral
10    Source Rule.  I don't see that as an issue before the Court.
11    It doesn't appear to be the basis for decisions made on the
12    same issue in other matters.  And I am also not going -- I'm
13    going to deny the motion for contempt.  I do not believe
14    Medport is in contempt at this time.  And I -- I don't need
15    any argument on that.
16            What I'd like to focus on is for the defendant, who
17    I'm going to ask to speak first, because I think this is a
18    preliminary matter that must be addressed, is why defendant
19    waited so long to bring the motion.  I am somewhat loathe to
20    elevate form over substance.  But this appears to be very much
21    delayed, and I'm just interested in that discussion.
22            And then, once we move past that -- because I'll hear
23    discussion on all points before I issue a ruling, which I
24    intend to do from the bench -- whether their -- whether the
25    proportional needs of the case result in the appropriate
```

TRANSCRIBED FROM DIGITAL RECORDING

1    disclosure of the documents sought by defendant.  And if so --

2    and, again, that would be limited to bias and impeachment

3    because I've said the Collateral Source Rule I don't see as

4    the issue before this Court.  But assuming so, it -- and I'm

5    not suggesting that that's the outcome, but if they were to be

6    disclosed, what protections could be afforded to ensure that

7    what I believe is appropriately identified at a minimum as

8    proprietary and confidential information is protected from

9    disclosure to the public and certainly outside this case.

10          So everybody -- because we have parties on the phone,

11   although I can see those who will be arguing, if you would

12   before you speak identify who you are and who you represent

13   and I -- we can move forward.

14          So defendant, as I said, I wanted to hear from you

15   first about the delay in bringing the motion.

16          **MR. GIBSON:**  All right.  Thank you, Your Honor.

17   Keith Gibson on behalf of defendants.  I'll just collectively

18   call them the Werner defendants for -- for the record.

19          As far as the reason for the delay, Your Honor, now,

20   the subpoena was served back in March, and Medport

21   subsequently responded providing two out of the three

22   categories of information that was sought, and they objected

23   to the -- the -- what I will call the second category or

24   the -- or the agreement category.

25          As far as in that process -- and one of the things

TRANSCRIBED FROM DIGITAL RECORDING

1    they talk about in their moving papers -- is that this

2    information is available through other sources. Well, part of

3    those other sources are taking the depositions of the medical

4    providers themselves and asking those medical providers the

5    substance of those agreements. That was then in this

6    [indiscernible], Your Honor, and from my understanding, in

7    this particular instance, all of the medical providers talked

8    about there was an agreement that the medical records/bills

9    were purchased for some percentage, but they couldn't remember

10    the specifics of the agreement. And they couldn't even

11    remember the percentages of the agreement themselves,

12    Your Honor. So we already tried an alternative source before

13    filing this particular motion before the Court.

14         And so I understand Medport's position, which is,

15    hey, these people should know and should be able to testify to

16    it; however, as we've -- I personally have experienced in my

17    own practice, many times when you depose a medical provider,

18    when it comes to their medical billing, most of the time it's,

19    "I don't know what the status of the medical bills are. I

20    don't really get involved in that. And you need to talk to my

21    person most knowledgeable regarding billing."

22         And so -- so as -- that's what essentially caused the

23    delay. And, in fact, this motion was actually originally

24    filed I believe on July 30th in the Louisiana -- Eastern

25    District of Louisiana, Your Honor. The Court said at that

TRANSCRIBED FROM DIGITAL RECORDING

1    time it didn't -- the issuing court did not have jurisdiction

2    to rule on the particular motion and denied the motion, which

3    in turn the Werner defendants retained our office to file

4    the -- this particular action as well as this particular

5    motion. And that's basically our limited involvement in this

6    matter at this point, Your Honor.

7          And so that's -- that explains the reason for the

8    delay in the filing.

9          As far as the proportional needs of the case, the

10   issue goes to the motive, to bias and impeachment of the

11   medical providers in this particular case, Your Honor. To the

12   extent that the medical providers have either ongoing

13   relationships or a desire for ongoing relationships with

14   Medport, that would potentially lead for potential bias of the

15   medical providers to testify in favor of plaintiffs because

16   the only way that Medport makes money under their business

17   model is if plaintiffs recover. If plaintiffs don't recover,

18   realistically Medport's not going to make any money on the

19   transaction. Just my understanding what I know about personal

20   injury law, that's usually what happens. If there's no

21   recovery, most of the time the medical providers are out --

22   you know, basically screwed for simplicity purposes.

23         To the extent, you know, you have differing

24   situations where -- and I don't know what the numbers are, so

25   I'm just using round numbers. And I'm -- we cite a case

TRANSCRIBED FROM DIGITAL RECORDING

1    called the *Thomas* case, and it kind of goes to an example of

2    that, where the medical providers will charge 60-, $70,000,

3    but the medical provider would have taken $70,000 and the fair

4    and -- expert will testify that the reasonable medical value

5    in, you know, Louisiana was, let's say, $10,000.

6            So you have a $50,000 incentive for the medical

7    provider to inflate his bills, first and foremost, as well as

8    potential to perform additional services that aren't necessary

9    and bill for services that aren't necessary at a higher rate.

10   I'm not getting -- without getting into the Collateral Source

11   Rule, that goes directly to the bias as to why they're finding

12   potentially causation in this particular instance.

13           And to kind of address briefly the disclosure

14   protections, all kinds of steps can be taken to ensure the

15   proprietary nature of the information that's [indiscernible].

16   We've dealt with confidentiality agreements with protective

17   orders that have a liquidated damages clause.  We have, you

18   know, where basically everybody agrees this information can be

19   disclosed, can be shared among each other.  To the extent any

20   motion or exhibit needs to be filed with the Court, there's a

21   procedural mechanism to file exhibits under seal to protect

22   the proprietary, confidential nature of those agreements.

23           This isn't -- and there's -- as far as if the case

24   ends up -- if this evidence ends up being admissible at trial,

25   we recently -- the Court may be familiar with the David

TRANSCRIBED FROM DIGITAL RECORDING

1    Copperfield case that occurred I believe last year in the

2    state court in Nevada, which during the course of hearing that

3    trial, David Copperfield had to testify as to how his magic

4    tricks or illusions were performed, which is frankly even much

5    more proprietary than the purchase of medical bills and what

6    the -- and it went up on an emergency writ to the -- to I

7    believe the Court of Appeals or to the Nevada Supreme Court.

8    I forgot which one of the two.  But they ruled that basically

9    you can seal the courtroom, you can basically kick anyone out

10   that doesn't -- that has -- other than parties that are

11   subject to the confidential nature of the protective order

12   that's already been disclosed.  So there's steps all along the

13   way to ensure that the information doesn't get out.

14         Additionally, most of the time the protective orders

15   also have what are called destruction clauses, which is you

16   are to destroy the evidence as soon as the case is concluded.

17   And as far as to avoid any type of conclusion as to what

18   "concluded" means, we can say as soon as the case is

19   dismissed, as soon as the case appeals are terminated or

20   whatever -- you know, we could phrase -- create phrases to

21   properly define that so that there is no issue as to that as

22   well as certifications from each of the parties where the

23   information is -- that it's been disclosed to destroy those

24   records.  So that way they would have something affirmative to

25   say, Hey, we've destroyed -- we've taken the steps to delete

TRANSCRIBED FROM DIGITAL RECORDING

1    the information off of our system, to remove it, to do

2    whatever we need to.  There's all kind of procedural

3    mechanisms in place that -- and those discovery and disclosure

4    of proprietary information happens in courtrooms throughout

5    the country.  So this isn't something that's foreign, unusual,

6    something groundbreaking as far as creating a confidential --

7    confidential order.  We're willing to do that.  We actually

8    offered that as a protection, but they -- Medport had no

9    interest in that and basically had argued that it's not

10   discoverable and we're not providing it.

11        **THE COURT:**  Have you, Mr. -- Mr. Gibson, rather,

12   discussed with Louisiana counsel whether or not the Louisiana

13   Federal Court is likely to grant the sealing of the documents,

14   grant sealing of the courtroom or sealing of the courtroom

15   during a -- testimony as to confidential information?

16        **MR. GIBSON:**  During my -- based on my conversation,

17   we -- my understanding is they are aware that the Court could

18   take protective measures to -- to that.  And Mr. Aucoin, who's

19   on the phone, can speak to that particular issue, if the Court

20   would like to hear it specifically as to any steps that the

21   Court may feel necessary to protect any privileged or

22   proprietary information on behalf of Medport.

23        **THE COURT:**  Certainly.  Because no order I make here

24   is effective to limit the Louisiana Federal Court's ability to

25   make its own decisions as to admissibility and use of

TRANSCRIBED FROM DIGITAL RECORDING

1    evidence.  So I appreciate all the steps that are available,

2    and were we in our court, I -- I certainly could ensure a

3    certain amount of those steps would be taken --

4           **MR. GIBSON:**  I would -- based on my experience with

5    other federal jurisdictions --

6           **THE COURT:**  Certainly.

7           **MR. GIBSON:**  -- such as, you know, I've been in front

8    of -- in Missouri, Illinois.  You know, they're not -- it's

9    not uncommon for them to take whatever steps are necessary to

10   seal documents, to, you know, redact whatever needs to be

11   redacted.  And that's not just in Federal Court.  That happens

12   in other -- other jurisdictions.  State courts as well,

13   Your Honor.

14          **THE COURT:**  Certainly.

15          **MR. GIBSON:**  So every court has a mechanism to ensure

16   the proper protection of confidential information just as --

17   and it's different.  Every little court has their, I'll call

18   it, nuance just as the procedure to seal records in

19   Clark County is different than the record -- to seal records

20   in Washoe County.

21          So you have different nuances as to how the records

22   are sealed, but the ultimate fact that the records are sealed,

23   you know, is -- you know, that's pretty much across the board.

24   Once they're sealed, they're sealed, and only certain people

25   are supposed to look at them and delete them and -- and I -- I

TRANSCRIBED FROM DIGITAL RECORDING

1   don't even know all the procedures that are protections.  But

2   with the electronic stuff, I'm sure that that's very capable,

3   Your Honor.

4              **THE COURT:**  Okay.  Thank you.

5              I'll just note before Mr. Kennedy speaks that -- and

6   I didn't say this initially -- that the motion to transfer is

7   denied, that I -- I find that there's appropriate jurisdiction

8   in this court to hear this matter.

9              **MR. GIBSON:**  All right.  Thank you.

10             **THE COURT:**  Do you have anything to add?  I'm sorry.

11             **MR. GIBSON:**  I was -- my only thing I was going to

12  address was if you have -- the only question was about the

13  motion to transfer --

14             **THE COURT:**  Okay.

15             **MR. GIBSON:**  -- and if --

16             **THE COURT:**  Thank you.

17             **MR. GIBSON:**  You just answered that, so...

18             **THE COURT:**  Thank you.

19             **MR. KENNEDY:**  I'm assuming that the other counsel

20  have nothing to -- nothing to add?

21             **THE COURT:**  Does counsel on the phone, Mr. Aucoin --

22  and I apologize if I'm not saying your name properly -- have

23  anything to add?

24             **MR. AUCOIN:**  Very briefly, Your Honor.  I will say

25  that on behalf of our firm we've agreed and would agree to a

TRANSCRIBED FROM DIGITAL RECORDING

1    protective order of the materials regardless of -- or without

2    respect to a court ruling.  So we voluntarily submit to a

3    protective order.  That's -- that's something that we would

4    [indiscernible] disclosure of those documents, you know, with

5    or without a ruling for the court -- from the Court.  That's

6    something that we were willing [indiscernible].

7          The only other thing, just to add as far as

8    proportionality is concerned, that the case is multiple

9    plaintiffs and damages in the near seven figures range.  So we

10   do believe that the requested information and alleged expenses

11   in the hundreds of thousands of dollars range justifies the

12   request for these contracts.

13           **THE COURT:**  Okay.  Thank you.

14           Mr. Kennedy.

15           **MR. KENNEDY:**  Thank you, Your Honor.

16           With respect to the delay, the Court's well aware

17   what the local rule says about emergency motions brought when

18   counsel has failed to control the calendar, and that's what

19   we've got here.

20           The -- first off, just in pure terms of time with the

21   service of the subpoena, it's almost five months from the time

22   of the service.  The objection was timely.  It was about eight

23   days or -- pardon me, about 13 days after service.  And

24   nothing happens until we find ourselves here on the 12th day

25   of August, which is the expiration of discovery.  And so

TRANSCRIBED FROM DIGITAL RECORDING

1    there -- there really is no legitimate explanation for this

2    delay.

3            What counsel said is, Well, you know, we tried to get

4    the information from other places, and -- and we couldn't get

5    it.  Where's that in the record?  That -- that's not there.

6    If you want to explain the delay and you want to say, Look,

7    here are all the efforts we made, those would be a part of the

8    motion because then you could say, in light of the exhaustion

9    of all of these other efforts, we find ourselves here truly in

10   an emergency.  We don't have any of that.  All we have is

11   somebody saying outside the record, Gee, you know, we looked

12   in some other places, and people couldn't remember.

13           Well, if you're trying to get the documents they're

14   trying to get that are in the subpoena in Item Number 2,

15   there's only one place to get those, and that is from Medport.

16   That's the -- that's the party that has those documents.  They

17   didn't do it until truly the 11th hour.  And so in -- in our

18   view, the motion's dead on arrival because it doesn't comply

19   with Local Rule 7.4.  In fact, it falls squarely within the

20   part of 7.4 that says the Court will decide whether or not

21   there's an emergency, and if there's not, that's grounds for

22   denying the motion.

23           On to the substance of the motion, which is the

24   discoverability.  Discoverability is, of course, two things:

25   Relevance to claims and defenses of a party and

TRANSCRIBED FROM DIGITAL RECORDING

1    proportionality.  In this case, we start with relevance, and

2    we've briefed that issue extensively as to why this

3    information is not relevant and is not -- is -- it has very

4    little -- essentially no chance of being admitted.  And then

5    the argument is made, well, maybe -- maybe we can impeach

6    somebody with this.  Maybe we can impeach somebody with this.

7    Well, exactly how would you do that?  This is not a lawyer

8    dealing with an expert -- pardon me, with a physician.  This

9    is a physician going out and engaging in an independent

10   transaction to factor his or her receivables.  And to say that

11   you're going to be able to impeach that physician because the

12   physician decided to factor the receivables, something that

13   most, if not all, doctors do nowadays, is extremely unlikely.

14   And if all you can say is, Well, we think we can do that, then

15   you've got to have some evidence to show that -- that that may

16   be viable.

17           Because that gets us into proportionality.  Are we

18   going to go through this whole exercise because -- because a

19   lawyer says, I need all these documents because I might be

20   able to use them for impeachment?

21           Okay.  My question is:  How's that going to work?

22   What evidence do you have that the witness, other than making

23   a pure factoring decision, is going to be impeached with the

24   factoring decision?  Because the doctor's going to say, Yes,

25   we factor our receivables.  You've got to have more than that.

TRANSCRIBED FROM DIGITAL RECORDING

1          On to the Court's last point, and that is if you

2     allow the discovery of these documents, which we don't think

3     you should, but if you do, what protections do you put in

4     place?  Well, this Court essentially would be issuing an

5     interim order because then -- the case is in District Court in

6     Louisiana.  What we would suggest to the Court is that you

7     have to give these documents at this point because all -- all

8     you're doing -- not just a placeholder but making an interim

9     decision -- is you have to put the highest protection on them

10    that's possible.  And we would suggest that, if they do have

11    to be produced, that they be produced under seal and that

12    nobody sees them until the Louisiana court makes a decision on

13    them.  Because, Your Honor -- as Your Honor said, and

14    correctly, you're not determining admissibility.  That's going

15    to be done in Louisiana.  So there is no reason that anybody

16    ought to be able to see those documents until the Louisiana

17    court makes a determination.

18         So this Court -- if the Court makes a decision that

19    they have to be produced, this Court can say, Well, produce

20    them under seal, and the Louisiana court, then they have them,

21    and they can make a decision at the time and place of trial as

22    to what happens to them.  But I do emphasize again the

23    motion's dead on arrival because there's no emergency.  This

24    is gamesmanship of the first order, and an argument about a

25    bunch of evidence that's not in the record.

TRANSCRIBED FROM DIGITAL RECORDING

```
 1              Secondly, in terms of proportionality, we go through
 2    this whole exercise because someone says, Gee, I might be able
 3    to impeach somebody with something like -- like this.  You're
 4    not going to be able to impeach with a pure business decision
 5    of factoring any more than you could impeach with somebody
 6    going out and -- and getting a loan.
 7              And, lastly, if the Court does order their
 8    production, they should be fully and completely sealed,
 9    transmitted to Louisiana, and let the trial judge there
10    decide.
11         THE COURT:  Well, I note, Mr. Kennedy, that the case
12    that you attached -- and I should have that name --
13         MR. KENNEDY:  Yeah, that's Exhibit 3.
14         THE COURT:  -- it is the Chambers case.
15         MR. KENNEDY:  Yeah.
16         THE COURT:  On page 10 of the document, the Court
17    does find the evidence admissible -- and, of course, that's
18    not my decision, but that court find the evidence of the
19    relationship is admissible for the sole purpose of impeaching
20    the credibility of plaintiff's treating physicians.  And other
21    cases have found likewise.  And without making that decision
22    here -- and by no means am I doing so -- it would suggest that
23    courts have found the documents discoverable for purposes of
24    arguing.  And my -- my --
25         MS. MOTTA:  Your Honor, I'm so sorry.  I'm sorry to
```

TRANSCRIBED FROM DIGITAL RECORDING

1    interject, and dis -- I mean no disrespect, but I actually was

2    the attorney on the *Thomas* case that you are talking about.  I

3    would love to interject at this moment.

4              **THE COURT:**  Okay.  Let me finish -- let me finish my

5    thought.  And please --

6              **MS. MOTTA:**  Yes, Your Honor.

7              **THE COURT:**  And please identify yourself and the

8    party you represent when you speak.  I understand it's

9    difficult.  We forget on the phone all the time.

10             So it suggests in that case and others that I read

11   that these types of documents have been discovered in other

12   cases.  Whether or not they have always been admitted is a

13   different issue, and my -- while, again, I am not making a

14   determination as to admissibility -- and plaintiffs' counsel

15   can certainly speak to the issue -- my initial thought is to

16   rule that they will be disclosed but that they will be

17   disclosed under a protective order under seal with attorney's

18   eyes only provisions until the court in Louisiana were to rule

19   on the admissibility, at which point counsel would obviously

20   have a right to look at them with their parties.

21             So that is my sense from reading the law.  I agree

22   with you that the delay here is -- was too much, and I would

23   caution counsel to be more careful.  But given that this is

24   going to trial in a month, I would rather leave the

25   admissibility -- which is the ultimate issue -- to the court

TRANSCRIBED FROM DIGITAL RECORDING

1    in Louisiana and allow the parties' counsel only to look at

2    the documents.

3            Now, let me -- if you want to respond to that before

4    plaintiff counsel speaks, that's fine.

5            **MR. KENNEDY:**  No.  I'm -- I am -- on my marked up

6    page 10 of that decision, I am sure that I know what counsel's

7    going to advise the Court of, and I will cede the floor to her

8    because she was counsel in that case.  But I'm pretty sure I

9    know what she's going to say.

10            **THE COURT:**  Okay.  Thank you, Mr. Kennedy.

11            **MS. MOTTA:**  Thank you, Mr. Kennedy.  And thank you,

12    Your Honor.  My apologies.  This is Vanessa Motta, and I'm

13    here for the plaintiffs on this matter.

14            Yes, I was the attorney that was for the *Kierra*

15    *Thomas versus Chambers*.  And there are a little bit of

16    words -- and, granted, no one was really there except another

17    attorney and myself, but I need to be very clear to explain

18    that there was never, ever a -- an admissibility or even a

19    discoverable in regards to the contracts.  That was never even

20    the issue.  The issue was to determine -- of the impeachment

21    of the bill.  Nothing of the contracts of Medport were to be

22    given out.  In fact, Judge Vance said no, they are not going

23    to come in.  They're not about the impeachment of that.  So I

24    just need to clarify that she denied any contracts to be given

25    to defense counsel.

TRANSCRIBED FROM DIGITAL RECORDING

1            Furthermore, the impeachment has to do with the bill.
2    So there's a universal charge rate they -- I believe defense
3    counsel there talked about the things that the doctor that --
4    that there's an inflation of bills by Medport.  No one
5    inflates any bills whatsoever.  It is just the bill and a
6    third-party company saying that there's an impeachment of the
7    amount, but it has nothing to do with Medport.  It only has to
8    specify on the physician.  And that's another reason why Judge
9    Vance also denied no knowledge of any other contract that had
10   nothing to do with the relative [indiscernible] proportion of
11   the case.
12           And finally, in regards to the medical bills in this
13   case, we're dealing with right now Medport's lien of
14   roughly -- of 152,000.  We're not near a seven-number figure.
15   So the -- the bills that are in question that have been
16   confirmed by the doctors that are in the same universal charge
17   rates and that they are being -- factoring to Medport, that's
18   the only issue here.  But like I said to Judge Vance,
19   Your Honor, she specifically said no on anything of the
20   contracts were discoverable or admissible in that case.
21           **THE COURT:**  I find on page 10 she -- this order says
22   evidence of the financial arrangement.  So that led me to
23   believe that the financial arrangement was not merely the
24   bills were disclosed.
25           And then on *ML Healthcare*, which I also took a look

TRANSCRIBED FROM DIGITAL RECORDING

1    at, it appeared that the contracts were disclosed, although

2    ultimately only admissible for purposes of impeachment and

3    bias.

4            So it was those two cases.  And there aren't a

5    tremendous number of cases on the subject matter where the

6    financial arrangements are the same as they are here.  It's

7    not an attorney-negotiated discount, and I understand the

8    distinction.

9            So -- but I thank you.  That helps, and I --

10           **MR. KENNEDY:**  My last point.

11           **THE COURT:**  -- yes.

12           **MR. KENNEDY:**  In the case that's attached as

13    Exhibit 3, the *Kierra Thomas* case, if the Court goes down to

14    the -- to the last paragraph on page 10 --

15           **THE COURT:**  Um-hum.

16           **MR. KENNEDY:**  -- the Court points out the business

17    relationship among the parties here in the second sentence.

18    It says, in *ML Healthcare*, the third-party funding company had

19    a business model of matching injured uninsured plaintiffs who

20    have viable tort claims with treating physicians.  That's the

21    business model that gives rise to the impeachment.  Because

22    you say, Look, you guys are partners.  You get referrals from

23    them.

24           **THE COURT:**  Um-hum.

25           **MR. KENNEDY:**  That is what distinguishes these other

TRANSCRIBED FROM DIGITAL RECORDING

1    cases, what I'll call the impeachment cases, from this case.

2    In this case, there is no business model like that.

3            We --

4            **THE COURT:**  Your --

5            **MR. KENNEDY:**  -- are not referring patients to

6    physicians in order to give them a motive to act or testify in

7    a certain way.  There is no relationship here between my

8    client and the physicians at all.  This is a pure

9    post-treatment factoring decision.

10           **THE COURT:**  Well, there is a relationship between

11   Medport and the physicians because Medport purchases or pays a

12   portion of the bills.  The -- and then is essentially assigned

13   the right -- strong word -- to collect the entire bill from

14   plaintiff and plaintiffs' counsel.

15           And I noted on page 3 of 25 of your brief that it

16   says Medport is not a health-care facility.  That is without a

17   doubt.  And it says that Medport is not involved in the

18   medical providers from whom it acquires accounts receivable.

19   But the brief doesn't make clear how Medport -- and I'm not

20   asking you to tell me that at this point -- how Medport gets

21   connected to health-care providers such that it can purchase

22   these bills.

23           And, again, this all goes to potentially the

24   admissibility of this evidence.  Because you're 100 percent

25   right, Mr. Kennedy.  If, in fact, you -- you know, Medport is

TRANSCRIBED FROM DIGITAL RECORDING

1   an entity that's well known in Louisiana and uninsured --

2   doctors who are treating uninsured PI clients are -- know that

3   they can get paid in this way, they may seek out Medport.

4          But that -- just as you pointed out, the evidence was

5   not before me regarding the testimony of the doctors.  That is

6   not before me.  So I'm left with a little bit of a vacuum, and

7   I noted that as I read through it.  But because of the time

8   constraints, I was not in a position to ask for additional

9   information, nor do I necessarily think that it's necessary

10   for my decision regarding discoverability as opposed to

11   admissibility, which are very different decisions.

12          **MR. KENNEDY:**  They are, indeed.

13          And just to answer your question, there's a national

14   market for medical liens

15          **THE COURT:**  Sure, sure.  And I understand that.  I'm

16   just not clear on how a doctor in Louisiana would find

17   Medport.  And when a doctor in Louisiana -- or anywhere for

18   that matter --

19          **MR. KENNEDY:**  Okay.

20          **THE COURT:**  -- would --

21          **MR. KENNEDY:**  I -- I go back, Your Honor, to my -- to

22   my last point, and that is what sort of protective order.  I

23   know the Court said attorney's eyes only.  I -- these

24   plaintiffs -- pardon me, these lawyers who are seeking -- the

25   defense lawyers who are seeking this, they're -- they're

TRANSCRIBED FROM DIGITAL RECORDING

1   involved in other cases.

2            **THE COURT:** I understand that.

3            **MR. KENNEDY:** So if you give them attorney's eyes

4   only on your order, they're going to see it here, and they're

5   going to see it in other cases.

6            **THE COURT:** And it's very hard for them not -- for

7   them to unsee it.

8            **MR. KENNEDY:** To unsee it. And that is why we ask

9   this. The safest course for this court, if it orders

10  production, is to say they'll be produced under seal to the

11  court. And we'll give a certificate of -- of production of

12  some sort, but that no lawyer should see it until the trial

13  court in Louisiana makes a decision. Because if you give --

14  if you give attorney's eyes only, they see it, and the court

15  in Louisiana says, No, you're not using this stuff, then they

16  know it.

17           **THE COURT:** But on a motion in limine, without

18  certain amounts of information, how do they argue against the

19  inadmissibility of those documents for purposes of impeachment

20  and bias assuming, as I believe is correct, the Collateral

21  Source Rule has no application here?

22           **MR. KENNEDY:** Yeah. And I think that -- I think you

23  deal with that with the -- with the court in Louisiana. That

24  court's got to make the decisions.

25           **THE COURT:** I understand they have to make the

TRANSCRIBED FROM DIGITAL RECORDING

1    decision.  My question is:  Does -- how does defendant oppose

2    plaintiffs' motion in limine without having any information

3    about the content of the --

4              **MR. KENNEDY:**  Oh, very easily.

5              **THE COURT:**  -- contract?

6              **MR. KENNEDY:**  You go to the District Court in

7    Louisiana, and you say, These have all been produced under

8    seal, Your Honor, and you have them.  Now we have to work out

9    a means for us to see them.

10             **THE COURT:**  Okay.  And --

11             **MR. KENNEDY:**  It's more -- more appropriate for the

12   trial court to do that because that's the trial judge sitting

13   on the case.

14             **THE COURT:**  And you would be amenable to defense

15   counsel having the opportunity to view the documents without

16   receiving copies of the documents in preparation for a motion

17   in limine?

18             **MR. KENNEDY:**  Well, I think that -- yeah, that would

19   be up to the judge in Louisiana to decide.  Because that's --

20   that's the -- that's the judge sitting on top of the trial,

21   and they'll say, Look, we have documents that have been

22   produced, they're under seal, now we need to have some means

23   of looking at them, Your Honor.  And -- and that's for the

24   trial judge to decide.  That's the person who's in the best

25   position to do that.  No offense to Your Honor, but --

TRANSCRIBED FROM DIGITAL RECORDING

1    **THE COURT:**  I'm not offended.

2    **MR. KENNEDY:**  I know you're not.  And -- and that's

3    the best person to do that, to say, I've got them here, now

4    what are we going to do with them?  As opposed to saying, I've

5    got them here, and somebody saying, Oh, yeah, we've seen them,

6    and on and on and on.

7    The judge there may have other protocols and

8    procedures that that judge wants to put in place with respect

9    to access to the documents.  The safest thing to do at this

10    point is, if the Court's going to order their production, to

11    say they'll be produced under seal, there'll be a certificate

12    of -- of -- of production, and the description of the

13    documents produced.  And we'll let the trial court in

14    Louisiana decide what to do with them.

15    **THE COURT:**  Thank you.

16    **MR. KENNEDY:**  That's the safest course, I think.

17    **THE COURT:**  Thank you, Mr. Kennedy.

18    **MR. KENNEDY:**  Okay.  Thank you.

19    **THE COURT:**  Counsel, do you have something further?

20    **MR. GIBSON:**  Yes, Your Honor.

21    Do you -- it seems the -- based on kind of your

22    discussion earlier, the big issue is how to properly disclose

23    the documents.  If -- if you want me to address the other

24    issues, I will.  But I believe that's the crux of where we're

25    at at this point.

1      **THE COURT:**  I think that's fair.

2      **MR. GIBSON:**  As far as what Mr. Kennedy has

3   proposed -- and I understand why he's proposing it -- the

4   whole -- I understand at this point you don't believe the

5   collateral source is triggered.  We don't know that until the

6   actual contracts themselves are actually disclosed, and those

7   are actually read by both sides, plaintiffs as well as

8   defendants' counsel.

9      Now, what they propose is basically delivering them

10  to the court and having an attorney basically go to the court

11  to read them.  That's -- you're basically asking them to draft

12  the motion in limine or the response thereto on site, which I

13  understand we have laptops and that sort of thing.  But that's

14  not the same thing as having -- when you're analyzing case law

15  and having the contract right next to you to exact --

16  determine the exact language that's in that particular

17  contract.  So I'm not sure that necessarily is a viable -- is

18  necessarily viable.

19     That being said, I think the -- I think there's ways

20  to even protect the "for your eyes only," which is, you know,

21  there's ways to encrypt or encode the documents that only

22  certain peoples with passwords have access to the particular

23  document.  So not just attorney eyes only.  It's like, okay,

24  we're putting this under here, we're putting a password, and

25  this password is explicitly to be limited to plaintiffs'

TRANSCRIBED FROM DIGITAL RECORDING

1    counsel and defendants' counsel.  You can even limit it so

2    it's not even to be given to their paralegals to -- you know,

3    there's ways to further reduce that as far as a technological

4    way of preventing additional disclosures.

5            Additionally, I believe as far as should copies of

6    the -- you know, I understand what their fear is, that they're

7    concerned about this information getting out.  They're

8    concerned about, well, once the attorney kind of sees it, they

9    can't unring the bell.  Once they read it, it's the same as if

10   they have a copy of it under that -- under that scenario.  So

11   I don't necessarily think that that -- that -- that is as

12   viable at -- an issue as he raises.

13           And my understanding from basically my conversation

14   with Medport's counsel, Marisa, is every one of these

15   transactions is its own transaction.  And so the fact that

16   what's discussed and purchased on -- for -- you know, in this

17   case, they might be the same amounts, they might not be.  But

18   say what happens in this case is the same as what happened in,

19   you know, say, the *Thomas* case or some other case that's

20   pending, we don't -- that's totally different information.

21   And so -- because my understanding is each one is its own

22   one-off deal.  In other words, the amount that they pay one

23   medical provider may not be the same as they pay another

24   medical provider, and all of that going back and forth.

25           So I think that there's protections such as password

TRANSCRIBED FROM DIGITAL RECORDING

1    protecting it, giving that -- making sure that that password's

2    only available to the attorney -- to the attorneys involved in

3    the case.  Because that's ultimately -- we have paralegals.

4    We have secretaries.  But if you limit it to just the

5    attorneys, that produces a less likelihood of accidental

6    disclosure as well as it's obviously not just our bar license

7    but their bar license in Louisiana as far as the improper

8    disclosure, and if there was a violation of any disclosure

9    issues, obviously the Court would have -- this Court would --

10    I believe would have access and the ability to issue any

11    necessary sanctions to potentially unring the bell, so to

12    speak.

13          And I understand, you know, from what I've -- based

14    on my conversations with Marisa, as far as the competitive

15    nature of the third-party litigation funding, everybody -- and

16    it's -- they don't want their -- certainly don't want their

17    percentages getting out, and they don't even want them getting

18    out among medical providers within the same case

19    [indiscernible] well, you paid this doctor 50 percent, this

20    doctor 40 percent.  And so I think, by limiting it to just the

21    attorneys, I think that's a -- a very safe compromise as well

22    as they would be under a court order and they would be

23    knowingly violating a court order should they mess that up.

24          Additionally, I think if it's -- the document is

25    password protected, there is technological ways of tracing

TRANSCRIBED FROM DIGITAL RECORDING

1    where the document went, who opened it, and that type of thing

2    if there was ever any issue with an accidental disclosure or

3    potential improper disclosure.

4            **THE COURT:**  Thank you.

5            I -- as you mentioned, I thought about what is really

6    the difference between reading it in a court and having it in

7    your office.  I do think there's a big difference to the

8    extent of control.  If it's at the courthouse and the judge is

9    overseeing the review of documents, certainly there's a level

10   of seriousness and a level of control that can be exercised.

11   That as much as I have no doubt that defense counsel would do

12   everything ordered to do because I don't believe that lawyers

13   risk their license with -- you know, easily -- and I don't

14   even know that that would risk a license -- but -- but I still

15   think that -- that I -- my -- my concern here is that I don't

16   have a complete picture.  There's information that wasn't

17   provided by defendant.  There's information that wasn't

18   provided by Medport.  And there's information that's been

19   provided by plaintiffs' counsel that could have been provided

20   by, you know, transcript or some other form perhaps that would

21   have better informed me on how the Court, specifically in

22   *Chambers*, treated the documents and ultimately, you know,

23   what -- what was admitted, although I understand -- and -- and

24   see what's in the order.

25           So what I'm going to do today, because this is a

TRANSCRIBED FROM DIGITAL RECORDING

1    trial that's going to take place in Louisiana and Louisiana

2    really should have the primary control over the decision, is

3    order that the documents at issue be produced under seal

4    within -- is five business days enough time to do that? -- to

5    the court in Louisiana with a certificate provided to all

6    counsel that that has occurred.  And that counsel -- that the

7    court in Nevada is giving leave to defendants to move to view

8    those documents in a manner that the Court sees fit prior to

9    motions in limine.

10           Now, I can't bind the court in Louisiana.  I can

11   simply say that that's my order, and the court in Louisiana

12   can do as it wishes.  But that would be -- that's my order

13   today, and I would recommend, Counsel, that -- defense

14   counsel, that you move quickly to view those and get a

15   determination from the Louisiana court and from the judge in

16   that case as to whether or not you may view those documents

17   and under what circumstances so that you may properly prepare

18   for a motion in limine, which I anticipate you will receive.

19           Any questions on my order?

20           **MR. KENNEDY:**  No, Your Honor.

21           **MR. GIBSON:**  No, Your Honor.

22           **THE COURT:**  Thank you.  Okay.  Any --

23           **MR. GIBSON:**  The only question is will the Court

24   draft its order, or does --

25           **THE COURT:**  Yes.  The defendant -- the Federal Court

TRANSCRIBED FROM DIGITAL RECORDING

1    always drafts its own order, and we should have an order out

2    today.

3        **MR. KENNEDY:**  Unless you're in Judge Mahan's

4    courtroom.

5        **THE COURT:**  Unless you're in Judge Mahan's court

6    perhaps.

7        Anything from counsel on the telephone?

8        **MR. AUCOIN:**  No.  Thank you, Your Honor.

9        **THE COURT:**  Thank you.  Plaintiffs?

10       **MS. MOTTA:**  Nothing for me, Your Honor.  I appreciate

11   it.

12       **THE COURT:**  Thank you.  Okay.  Court is in recess.

13       *(Proceedings adjourned at 3:44 p.m.)*

14                              * * *

15       I, AMBER M. McCLANE, court-appointed transcriber, certify

16   that the foregoing is a correct transcript transcribed from

17   the official electronic sound recording of the proceedings in

18   the above-entitled matter.

19

20   /s/ *Amber M. McClane*            8/22/2019

21       AMBER MCCLANE, RPR, CCR #914     Date

22

23

24

25